# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\* \*
FRANCESCA MICELI, as    \*
Administratrix of the Estate of    \*
MARGUERITE MICELI,    \*
   \*    No. 10-131V
       Petitioner,    \*    Special Master Christian J. Moran
   \*
v.    \*    Filed: March 12, 2015
   \*
SECRETARY OF HEALTH    \*    Findings of Fact
AND HUMAN SERVICES,    \*
   \*
       Respondent.    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\* \*

<u>F. John Caldwell, Jr.</u>, Maglio, Christopher & Toale, PA, Sarasota, FL, for petitioner;
<u>Debra Filteau-Begley</u>, United States Dep't of Justice, Washington, DC, for respondent.

## <u>Unpublished Ruling Finding Facts</u>[1]

     Marguerite Miceli filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §300aa—10 through 34 (2006), on March 1, 2010.  In her petition, Marguerite alleged that the human papillomavirus ("HPV") vaccines she received on July 10, 2007, and September 14, 2007, caused her to suffer systemic lupus erythematosus ("SLE"), Raynaud's disease, and fibromyalgia.  Petition at 1, 3, 5.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

The documentary evidence relating to Marguerite's health in 2007 was not consistent.  To find the facts about this critical topic, a hearing was held.  See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006).  Following the hearing, the parties submitted additional material.  This ruling resolves the disputed facts.

## **Procedural History**

The petition was filed on March 1, 2010.[2]  Over the next eight months, Marguerite filed medical records (exhibits 1-10) and her affidavit (exhibit 11).

The Secretary reviewed this material and noted that some medical records appeared to be missing.  The Secretary particularly requested records from Jonathan Dixon, a rheumatologist, whom Marguerite saw for her lupus.  The Secretary also maintained that based upon the existing record, Ms. Miceli had not established that the HPV vaccine caused her lupus.  Resp't's Rep., filed Mar. 14, 2011.

Marguerite collected additional records, including those from Dr. Dixon, over the next five months.  Marguerite also filed a second affidavit.  Exhibit 18.  This affidavit, which contained four paragraphs, did not assert when she started having signs or symptoms associated with lupus.

In an August 12, 2011 status conference, the parties began to plan for a hearing during which Marguerite and other people familiar with her health in 2007 would testify.  As part of this process, Marguerite submitted affidavits from two witnesses, Sylvia Miceli (her mother) and Francesca Miceli (her sister).  Exhibits 23 and 24.

The three Micelis testified at a hearing held by videoconferencing on December 5, 2011.  The testimony suggested that other sources, such as Marguerite's employer and her school, may have created documents that could inform a determination about Marguerite's health.  Marguerite also stated that she

---

[2] Originally, the petitioner was Marguerite Miceli.  However, while the petition was pending, Marguerite died.  After Marguerite's death, her sister, Francesca Miceli, became the administrator of her estate and became the petitioner.  See exhibit 37 and order, filed November 8, 2012.

Consistent with the parties' practice, this ruling refers to Marguerite Miceli as "Marguerite."  This differentiates her from her sister.

periodically posted to Facebook during the relevant time. Hence, she was ordered to obtain these documents. Order, issued Dec. 5, 2011.

Marguerite complied with the order to obtain additional documents, although the process for obtaining her Facebook postings took longer than expected. Marguerite assembled this record herself. She did not request the information from Facebook. By July 2012, it appeared that the record was sufficiently complete that the parties could begin the process of proposing findings of fact.

However, on September 10, 2012, Marguerite died. Exhibit 38 at 2. The autopsy listed her cause of death as acute respiratory distress syndrome secondary to thrombotic thrombocytopenic purpura in the setting of systemic lupus erythematous. Exhibit 39 at 3. Her death, as described in footnote 2 above, prompted a substitution for the petitioner.

As the parties reviewed the filed records to propose findings of fact, they determined that more medical records remained outstanding. Although many of these records documented treatment occurring years after Marguerite was diagnosed with lupus, the petitioner wanted to obtain them. The process of collecting written materials concluded in January 2014, when the petitioner filed a set of explanation of benefits from her insurance company. Exhibit 40.

Following that submission, the parties jointly crafted a set of proposed findings of fact. This document highlights the disputes the parties have regarding Marguerite's health in the months shortly before and shortly after her vaccinations. With the submission of the proposed findings, the matter is ready for adjudication.

## Standards for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records created contemporaneously with the events

they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient.  Completeness is presumed due to a series of propositions.  First, when people are ill, they see a medical professional.  Second, when ill people see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is Cucuras, in which the petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination.  Cucuras, 993 F.3d at 1527.  A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions by judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (2010) (stating, "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating, "[t]he special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record

professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously-created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

Special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims listed four such explanations.  Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously-written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).  However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health &

5

Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records.  An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying.  Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

These criteria are considered in the analysis below.

## Findings of Fact

The facts regarding Marguerite's medical history are discussed below in chronologic order beginning with her health in 2007 before receiving the first dose of HPV vaccine, her health after July 10, 2007 (the date of the first vaccination), and continuing through to her treatment by Dr. Dixon in September 2007.

### I.     Health before July 10, 2007

Marguerite was born in January 1989.  Her health for her first 17 years is not contested.  The parties agree that medical records periodically created during this time show that she suffered from allergies and had sore throats.  The petitioner summarized many of those records.  Joint Motion for Findings of Fact ("Jt. Mot."), filed May 26, 2014, at 3-4.  Since the parties do not dispute the accuracy of the records created before 2007, they are not reviewed in this ruling.

A. In spring 2007, Marguerite experienced
several illnesses, but coped with them.

The controversy begins with Marguerite's health in March 2007, when she was a senior at Mercy High School.  The Secretary argues that "Marguerite experienced a prolonged period of illness that began in March or April, 2007."  Jt. Mot. at 2.  Petitioner acknowledges that Marguerite experienced episodes of ill health but she had recovered by July 10, 2007.  Id. at 3-4.

Overall, the parties' dispute is more a difference in degree, not a difference in kind.  Petitioner does not contend that Marguerite was in perfect health.  Such an

Case 1:10-vv-00131-UNJ   Document 117   Filed 04/03/15   Page 7 of 14


argument would conflict with multiple medical records created in spring 2007, showing various illnesses. Rather, petitioner is maintaining that Marguerite's health in spring 2007 did not interrupt her daily life.

The short answer is that the Secretary's view is more persuasive. The Secretary better accounts for all the evidence, including Marguerite's decision to live at home for her first year of college due to her ill health and Dr. Dixon's September 17, 2007 letter recounting a history of medical problems for six months. The Secretary's portion of the Joint Motion was organized around discrete symptoms that Marguerite experienced in spring 2007. In contrast, although the petitioner had an opportunity to address each of the Secretary's points, the petitioner's portion of the Joint Motion falls short of presenting a persuasive account of Marguerite's health. The petitioner ignores most of the oral testimony.

The Secretary asserted that the "most persuasive evidence" about Marguerite's health in the spring of 2007 was that she decided to attend college at the West Hartford branch of the University of Connecticut. With this decision, Marguerite was choosing to remain relatively close to her home in Cromwell, Connecticut, rather than travel to the main campus of the University of Connecticut, which is approximately 40 miles away in Storrs. See Jt. Mot. at 2-3 (setting forth the Secretary's contention).

The Secretary's assertion that Marguerite's health was an important and perhaps controlling factor in where she was attending college is amply supported. Both Francesca Miceli and Sylvia Miceli linked Marguerite's health to her college-location decision. Tr. 115, 189. In addition, the Secretary established that Marguerite made this decision in mid-April 2007. For this point, the Secretary relied upon an exchange of Facebook posts. Marguerite told a friend that she picked the "UConn West Hartford branch for like a year or two and then goin[g] to Storrs." Exhibit 33 at 13; see also id. at 7; cf. exhibit 3 at 4 (Dr. Mendelson's July 17, 2007 note stating that Marguerite will be attending "University of Connecticut in West Hartford shortly").

It is telling that although the Secretary characterized the evidence relating to selection of college as the "most persuasive evidence," petitioner does not address this evidence at all. See Jt. Mot. at 3-7. If petitioner could explain Marguerite's decision-making in some other way, then petitioner should have produced that alternative account. As the record stands, the evidence indicates that Marguerite chose to go to college at one location, which she ended up hating (see exhibit 33 at 11), rather than at a preferred location because she was sick.

Marguerite testified that she was "very sick in the second half of my senior year."  Tr. 26; accord id. at 31; but see exhibit 24 (Mercy High School records) at 2 (showing she was absent two days during her senior year).  She recollected that she started suffering from a "virus" potentially as early as March 2007 persisting until the end of June 2007.  Tr. 31-32.

Some medical records support Marguerite's testimony about a lingering illness starting in March 2007.  Most prominently, Marguerite told her rheumatologist, Dr. Dixon, in September 2007 that her "fatigue, headaches, hair loss and diffuse musculoskeletal discomfort" started six months earlier.  Exhibit 1 at 44.  Although it would be a stretch to describe Dr. Dixon's record as an account created contemporaneously with events in the spring 2007, see Shapiro v. Sec'y of Health & Human Servs., 101 Fed. Cl. 532, 539 (2011) (discussing the meaning of contemporaneous), mot. for recons. denied after remand, 105 Fed. Cl. 353 (2012), aff'd, 503 Fed. Appx. 952 (Fed. Cir. 2013), Dr. Dixon's record retains some probative value.  He was the first rheumatologist whom Marguerite saw.  In his role as a specialist, it seems likely that Dr. Dixon asked questions about her history that may not have occurred to a non-specialist.  See Berry v. Sec'y of Health & Human Servs., No. 01-556V, 2006 WL 2848617, at *11 (Fed. Cl. Spec. Mstr. Sept. 13, 2006) (emphasizing history given to first rheumatologist).

When questioned about Dr. Dixon's notation that she has been experiencing symptoms "going back about six months," Marguerite referred to her illness in the spring 2007.  Tr. 26, 67.  In this context, she denied having hair loss and joint pains before July 2007.  Tr. 26-27.  On cross-examination, Marguerite asserted that after July 2007, her fatigue started to be so draining that she needed rest to function.  She denied feeling tired in the spring 2007, when she thought she had a viral infection.  Tr. 65.

In the joint motion, petitioner, again, did not address directly the Secretary's reliance on Dr. Dixon.  Instead, petitioner's argument is that Marguerite's illness in spring 2007 did not affect her activities.  The basis for this contention is that Marguerite saw relatively few doctors in the spring 2007, and if she were experiencing more consistent problems, she would have visited doctors frequently.  See Jt. Mot. at 3-7.  In effect, petitioner is relying upon the absence of information in a medical record created contemporaneously.[3]

---

[3] Petitioner's reliance on the lack of a medical record is unusual.  More typically, the Secretary points out that if a person were experiencing a significant health problem usually close

Several reasons support a finding that Marguerite was ill in spring 2007. First, Marguerite testified about her illnesses in spring 2007. She stated that her recovery from a virus "was just a long process, slow recovery, . . . bed rest." Tr. 32. Thus, petitioner's argument is really contrary to Marguerite's testimony. Second, the problems Marguerite recounted to Dr. Dixon are not terribly severe. It seems relatively less likely that an 18-year-old woman, who had a history of some chronic health impairments like allergies, would quickly seek medical attention for apparently small medical issues. For example, Marguerite saw her primary care doctor on May 31, 2007. Then, she recounted that she was having hives off and on for two days as well as fevers and chills for three weeks. Exhibit 1 at 66; see also Tr. 36-37.[4] This record demonstrates that Marguerite did not go to doctors' offices readily.

Moreover, the surrounding evidence tends to confirm that although she was ill, she was not incapacitated in spring 2007. As noted earlier, she missed only two days of school. Exhibit 24 at 2. She maintained a job at her family's pizza restaurant. Tr. 90-91. She stated that there were "not too many activities after school I couldn't go to." Tr. 32. One of her primary activities was completing a community service project to earn her Gold Award from the Girl Scouts. While the Girl Scouts conferred this award on her in 2008, Marguerite performed the tasks for the award during her senior year of high school. Tr. 90.

B. By the end of June 2007, Marguerite's spring 2007 illnesses resolved.

Marguerite graduated from high school on May 31, 2007. Tr. 31, 112. There was extensive testimony that Marguerite was too sick to participate in the graduation ceremony. Her doctor advised her not to walk across the stage.

---

in time to a vaccination, then the person would have visited a doctor. E.g. Mueller v. Sec'y of Health & Human Servs., No. 06-775V, 2011 WL 1467938 (Fed. Cl. Spec. Mstr. Mar. 16, 2011); Mojabi v. Sec'y of Health & Human Servs., No.06 -227V, 2009 WL 3288324, at *9-11 (Fed. Cl. Spec. Mstr. May 29, 2009).

[4] The doctor's note for this visit is found on pages 10 and 66 of exhibit 1. The doctor's handwriting is difficult to understand. After the hearing, records from Marguerite's insurance company indicated that the visit took place on May 31, 2007, not May 21, 2007, as initially believed. Exhibit 40 at 42. The visit on May 31, 2007 confirms Marguerite's testimony that she saw her pediatrician on the day she graduated. Tr. 47-48.

Marguerite felt really tired.  She also had a fever, and possibly had pink eye and a sore throat.  Tr. 31-32, 57-58, 100-01, 123-26, 152, 164.

The testimony about Marguerite's pink eye was vague, perhaps because of the passage of time.  It seems likely that Marguerite began suffering from pink eye shortly before May 31, 2007.  Francesca indicated that her sister had pink eye on graduation. Tr. 123-26.  Marguerite testified that the pink eye persisted and switched eyes. Tr. 35.  She testified that it went away two weeks after she was given medication and, later, indicated that she was taking medication for pink eye on June 13, 2007. Tr. 58, 60; see also Tr. 101.[5]

On June 13, 2007, Marguerite called the office of her allergist, Dr. Mendelson reporting that she was sick for two weeks.  The note from the phone call also states "[h]ives every where [sic]" and "lump in throat, had a fever a [week] ago."  Exhibit 3 at 32, accord Tr. 49-50.  An office note indicates that a staff member returned the call after consulting Dr. Mendelson, who had not seen Marguerite in two years.  The staff member communicated that Dr. Mendelson recommended that Marguerite see her primary care physician.  Exhibit 3 at 31; Tr. 51.

At an appointment with Dr. Mendelson on July 9, 2007, Marguerite told him that "two weeks" before this visit, she "started having some swelling of her eyes and some itchiness and hives all over her body."  Marguerite also reported that she "was given some Benadryl, some antihistamines, and a short course of prednisone."  Exhibit 3 at 4.  The records do not indicate the doctor who prescribed these medications and Marguerite did not remember.  See Tr. 62.  In any event, by the appointment with Dr. Mendelson, Marguerite reported that the "hives are getting better." Exhibit 3 at 4.  Marguerite was not taking any medication and an examination of her "head, eyes, nose, and throat was normal."  Dr. Mendelson's lack of findings tends to corroborate the testimony that Marguerite's health

---

[5] An alternative account is that Marguerite started having pink eye in early April 2007. Marguerite associated her April 4, 2007 visit to Middlesex Hospital with having the start of pink eye. Tr. 19-20, 65.  However, in that visit, Marguerite complained about a bump on the back of her head for three days.  The emergency room doctor identified the problem as an infected lymph node and recommended follow-up with Marguerite's regular doctor.  Exhibit 9 at 4; Tr. 20.  It seems likely that if Marguerite were complaining about itchy or crusty eyes, the emergency doctor would have noted this problem.  Moreover, although Marguerite testified that she missed school because pink eye is contagious, the school records show that she missed only two days of school her senior year.  It seems more likely that the doctor's concern about spreading pink eye occurred in conjunction with Marguerite's graduation on May 31, 2007.

problems, which had started by early April 2007, came to an end by the end of June 2007.  Tr. 60, 124-25, 139, 164-66.

## II.   First HPV Vaccination (July 10, 2007) through Second HPV Vaccination (September 14, 2007)

On July 10, 2007, Marguerite returned to her pediatrician.  The doctor's handwriting is difficult to understand, but appears to reflect a relatively normal examination.  In the course of this visit, Marguerite received a dose of the meningococcal vaccine and a first dose of the HPV vaccine in her left arm. Exhibit 1 at 29; Tr. 16.

### A.  Marguerite's arm pain began within two days of her July 10, 2007 vaccinations and resolved in approximately two weeks.

The parties agree that after these vaccinations, Marguerite experienced pain in her arm around the site of the vaccination.  See Jt. Mot. at 12-14.  However, the parties disagree about the duration and intensity of the pain.

Once again, the Secretary discussed all the evidence comprehensively, while the petitioner did not advocate for a specific finding.  Under these circumstances, the Secretary's argument that "[t]here is not a preponderance of evidence that Marguerite's arm symptoms were as severe as asserted by Marguerite in her testimony," is more persuasive.  Jt. Mot. at 12-13.

Marguerite started having pain in her left arm within two days of her vaccinations.  Tr. 16, 69-71, 104-05, 166.  Marguerite spent the weekend of July 12, 2007, with Francesca in Boston.  Exhibit 24 (Francesca's affidavit) ¶ 7; Tr. 141 (testimony that the weekend is recorded on Francesca's electronic calendar). During their time together, the sisters walked around Boston extensively.  Tr. 143-44.[6]  Francesca noticed that Marguerite did not carry things and occasionally winced while moving her arm.  Tr. 113, 127.  The arm pain resolved in approximately two weeks.  Tr. 71.

---

[6] Francesca's testimony contradicts Marguerite's account that she felt so sick that she could not get out of bed while they were in Boston.  Tr. 68-69.

###### B. In August and September 2007, Marguerite experienced masses on her elbow and some hair loss.

Within a few days of returning from Boston, Marguerite developed small masses on her elbow.  Particular bumps came and went, but, on a whole, they persisted through September 13, 2007, when Marguerite had another appointment with Dr. Mendelson.  Tr. 63-64; exhibit 3 at 3.

Around this same time, Marguerite started to lose some of her hair.  Tr. 73. Francesca testified that Marguerite told her that she (Marguerite) was losing some hair when Francesca attended the family's graduation party for Marguerite in August 2007.  Tr. 114, 144.  Marguerite also told Dr. Mendelson, in September 2007, that she had been losing her hair.  Exhibit 19 at 1.[7]  This evidence establishes that Marguerite was losing some hair beginning sometime in August 2007. Marguerite's loss of hair was not extreme because Dr. Dixon found, as part of his physical examination of her, "no significant alopecia."  Id. at 2.[8]

###### C. In August 2007, Marguerite episodically experienced swollen hands.

Another symptom discussed by Marguerite and the other witnesses is swelling, particularly in Marguerite's hands.  Here, the information supporting the testimony is sparse.  Marguerite's history to Dr. Dixon on September 19, 2007, included a report that "[o]n one occasion[,] she had some swelling and pain in her left earlobe."  Exhibit 19 at 1.  Dr. Dixon did not find any peripheral edema as part of his physical examination.  Id. at 2.  Dr. Dixon's note tends to show that Marguerite experienced swelling very infrequently as she said swelling happened once.

An inference of rare swelling is not consistent with the witnesses' testimony. Marguerite, Francesca, and their mother averred that Marguerite was having swollen hands by the August 2007 graduation party.  See Tr. 73, 114, 129-31, 158. With the benefit of knowing that Marguerite was diagnosed with systemic lupus

---

[7] Dr. Dixon recorded that Marguerite was having various symptoms, including hair loss, "going back six months."  Exhibit 19 at 1.  It appears that Marguerite did not distinguish the hair loss from the other problems that, in fact, started in the spring 2007.

[8] Dr. Mendelson ordered blood tests, which showed that Marguerite had a positive antinuclear antibody and her erythrocyte sedimentation rate was slightly elevated.  Exhibit 3 at 21.

erythematosus later, the undersigned can find that Marguerite experienced swelling in her hands in August 2007. Lupus symptoms wax and wane. Thus, the lack of swelling on September 19, 2007, when Dr. Dixon examined Marguerite does not automatically exclude the possibility that Marguerite experienced swelling on other occasions. Collectively, the witnesses' testimony was sufficiently convincing to establish that Marguerite had swollen hands in August 2007 episodically.

### III.   Second HPV Vaccination (September 14, 2007) and Dr. Dixon

Four days after the visit with Dr. Mendelson, Marguerite returned to her pediatrician's office. The notes for the September 14, 2007 appointment indicate only that Marguerite received the second dose of the HPV vaccine in her left arm. Exhibit 1 at 67.

On September 17, 2007, on referral from Dr. Mendelson, Marguerite saw Dr. Dixon for the first time. Dr. Dixon recorded a relatively lengthy history, going back to the spring 2007. Based upon the history, results from laboratory tests, and physical examination, Dr. Dixon was "a bit concerned that some autoimmune process may be brewing." Exhibit 19 at 2. Dr. Dixon did not see her case as clearly fitting the criteria for lupus. Id.

#### A.   Following her September 14, 2007 HPV vaccine, Marguerite's symptoms did not worsen in the next two days.

The history does not reflect an abrupt onset for Marguerite's symptoms. Marguerite testified that after the second dose of the HPV vaccine, her problems intensified. Tr. 19, 82-83; see also Tr. 115-16 (Francesca's testimony), 134 (same). However, Dr. Dixon's notes do not reflect a rapid worsening after the second vaccination and Marguerite did not recall whether she told Dr. Dixon that she had deteriorated recently. Tr. 68, 83. Given the thoroughness of Dr. Dixon's history, it seems unlikely that Marguerite's health declined precipitously between the September 14, 2007 vaccination and the September 17, 2007 appointment with Dr. Dixon. If Marguerite's symptomology had increased in severity, it seems likely that she would have mentioned that to Dr. Dixon and Dr. Dixon would have included that information in his history.

#### B.   Following her September 17, 2007 appointment with Dr. Dixon, Marguerite's health declined.

As reflected in other medical records, Marguerite's health did decline after the visit with Dr. Dixon. For example, on October 3, 2007, she visited an

emergency room.  Exhibit 17 at 10.  The parties are in agreement that the records created after Dr. Dixon accurately reflect Marguerite's health problems at the time the records were created.[9]

## Conclusion

The parties are ordered to provide these findings of fact to any expert whom they have retained to testify.  Expert opinion inconsistent with these findings of fact is not likely to be persuasive.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record"); Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1376 n.6 (Fed. Cir. 1994) ("An expert opinion is no better than the soundness of the reasons supporting it."); see also Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1574 (Fed. Cir. 1993) (the assumption of an expert about the accuracy of a fact witness's testimony does not "substantiate" the fact witness's testimony).

A status conference is set, sua sponte, for **Tuesday, April 7, 2015 at 10:30 A.M.**  The parties should be prepared to propose the next step in this case.

Any questions may be directed to my law clerk, Mary Holmes, at (202) 357-6360.

**IT IS SO ORDERED.**

S/Christian J. Moran
Christian J. Moran
Special Master

---

[9] The distant histories in those records are not always consistent with each other or with the present Findings of Fact.  When the records conflict, the Findings of Fact control.